```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                  CORPUS CHRISTI DIVISION
```

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| vs. | § § | Criminal No. C-06-272 |
| JOSE ANGEL SALAZAR-VASQUEZ, OSCAR GARZA, and CELESTINA GARZA, | § § § § § | |
| Defendants. | § § | |

**ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS**

On this day came on to be considered Defendants' Motions to Suppress (D.E. 42, 43, 46), to which the Government filed a response (D.E. 50). For the reasons discussed below, Defendants' motions to suppress are DENIED.

## I.   BACKGROUND

On March 19, 2006, United States Border Patrol agents received a report of suspicious activity from a citizen, indicating that approximately ten individuals had just entered the back door of a house in Falfurrias, Texas. (Suppression Hearing, July 12, 2006, ("SH") at 2:04:40, 2:32:05.) In response to the report, United States Border Patrol Agents Arnoldo Diaz and George Gamez met with Brooks County Sheriff's Deputy Daniel Davila (collectively "the officers") at the house in question. (SH at 2:05:15.) With Deputy Davila in the lead, the officers approached the front door of the house. (SH at 2:05:40, 2:32:35.) Deputy Davila knocked at the

-1-

front door of the house and a woman he recognized as Vanessa Kiser ("Kiser") answered, opening the door only about "five inches." (SH at 2:06:05, 2:33:10, 2:34:10.) Deputy Davila began having a conversation with Kiser. (SH at 2:06:20, 2:33:15.) Deputy Davila informed Kiser about the report that numerous individuals had recently entered the house, and asked her if she had seen any one in the house. (SH at 2:33:15.) Kiser indicated that she had not seen anyone enter the house and had been in one of the bedrooms for most of the day. (SH at 2:33:20, 2:34:00.) Deputy Davila told Kiser that he just wanted to make sure that she was "fine." (SH at 2:34:25.) Deputy Davila then asked Kiser who the owners of the house were, and Kiser indicated that the house was owned by Oscar and Celestina Garza.[1] (SH at 2:34:50.) Deputy Davila also asked Kiser if she resided at the house, and she indicated that she had been living there with her children for approximately a week. (SH at 2:34:55, 2:36:05, 3:00:15.) Kiser informed Deputy Davila that Oscar and Celestina Garza were currently in Corpus Christi with Kiser's children. (SH at 2:35:00.) Kiser also indicated that, although she did not have a key to the house, she could come and go from the house freely. (SH at 2:36:05.)

Deputy Davila then asked Kiser for permission to search the

---

[1] Kiser appears to have been under the mistaken impression that Oscar and "Sally" Garza were the owners of the house. (SH at 3:00:40.) Officers later learned that the house was actually owned by a Mr. Esquivel and that Oscar and Celestina Garza rented the house from Mr. Esquivel. (SH at 3:00:50.)

-2-

house, but informed her that he could not go in the house unless she gave her consent. (SH at 2:35:35.) Kiser asked to speak with Deputy Davila alone, away from the Border Patrol agents. (SH at 2:36:05.) Kiser told Deputy Davila in private that "she didn't want to get in trouble." (SH at 2:36:50.) When Deputy Davila asked Kiser what she meant by that statement, Kiser said that she didn't know whether or not she could give permission to search the house. (SH at 2:36:55.) Deputy Davila responded that, because she was a resident of the house with the freedom to come and go as she pleased, she could "give consent if [she] want[ed] to." (SH at 2:37:00.) Kiser reiterated that she "just [didn't] want to get in trouble." (SH at 2:37:10.) At some point, Kiser also asked Agent Diaz what would happen if she decided not to consent to the search. (SH at 2:07:45.) Agent Diaz informed her that if she didn't want to consent, that was "fine." (SH at 2:07:50.) Kiser responded that "y'all are going to find them anyway if I don't." (SH at 2:08:00, 2:16:50.) Agent Diaz told Kiser that if she didn't want him there he would leave the premises, but he also warned her that he would go park his vehicle across the street and contact the Immigration and Customs Enforcement agency to inform them that he suspected illegal activity, and would turn the investigation over to them. (SH at 2:08:00, 2:09:15.) Deputy Davila added that, "if there are people are in the house that shouldn't be there, you need to let us know." (SH at 2:37:15.) Kiser then opened the door and said "you can come in and search the house." (SH at 2:37:25.)

Deputy Davila and Agent Diaz then entered the house. (SH at 2:09:50, 2:37:40.) The officers immediately saw nine subjects in the kitchen, trying to stay out of view of the front door. (SH at 2:09:55, 2:38:10.) The officers also searched the other rooms of the house and found two more individuals in a bedroom upstairs, and another individual in a shower downstairs.[2] (SH at 2:11:00, 2:39:50, 2:40:30.) The border patrol took Kiser, and the other individuals found in the house, into custody. (SH at 2:41:00.) The officers later determined that the twelve individuals found in the house were illegal aliens. (SH at 2:41:00.) Furthermore, upon interviewing Kiser, immigration officials learned that Kiser was living at the house with Oscar and Celestina Garza in exchange for performing certain housekeeping duties. (SH at 3:12:00.)

On April 12, 2006, a four-count indictment was returned against Defendants Oscar Garza, Celestina Garza, and Jose Angel Salazar-Vasquez, charging them with knowingly harboring several illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(ii). (D.E. 15.) On May 23, 2006, Defendant Celestina Garza moved to suppress all evidence and statements obtained from the March 19, 2006, search of her home. (D.E. 42.) On May 24 and June 12, 2006, Defendants Oscar Garza and Jose Angel Salazar-Vasquez filed similar motions with the

---

[2] The officers testified that, in inspecting the house, they only searched those areas where a person could be hiding. (SH at 2:10:40, 2:39:15.)

Court.³  (D.E. 43, 46.)  The Court held a hearing on Defendants' motions on July 12, 2006, at which Deputy Davila and Agent Diaz both testified.  Special Agent Steve Santini and one of the aliens in the house, Jose Del-Carmen Guillen-Gaspar, also testified at the hearing.  Following the hearing, the Court allowed the parties time to file additional briefing on the motions to suppress, which the parties did on July 19, 2006.  (D.E. 53, 54, 56.)

**II.  DISCUSSION**

A "search conducted without a warrant is unreasonable *per se* and therefore unconstitutional under the Fourth Amendment, unless it is conducted pursuant to consent or under exigent circumstances."  See, e.g., United States v. Gonzales, 121 F.3d 928, 938 (5th Cir. 1997); United States v. Richard, 994 F.2d 244, 247 (5th Cir. 1993)).  The Supreme Court has long held that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Gonzales, 121 F.3d at 938; Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Consent, however, "need not be given by the defendant himself."  United States v. Solis, 299 F.3d 420, 436 (5th Cir. 2002).  Rather, it is well-settled that law enforcement officers "may conduct a warrantless search . . . if a *third party*

---

³ Because the Court finds that the officers did not violate the constitution in conducting their search of the house, the Court need not also decide the issue of whether Defendant Salazar-Vasquez has standing to object to the search.

with common control over the area consents to the search." Id. "When the government seeks to justify a warrantless search on the theory that consent was lawfully obtained from a third party, rather than from the person whose property was searched or seized, the government bears the burden of proving that the third party had either actual or apparent authority to consent." Gonzales, 121 F.3d at 938 (citing United States v. Matlock, 415 U.S. 164, 171 n.7 (1974) and Illinois v. Rodriguez, 497 U.S. 177, 188 (1990)).

    **A.**    **Search Pursuant to Consent**

        **1.**    **Actual Authority**

A person has actual authority to consent to a search when she "possess[es] *common authority* over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Shelton, 337 F.3d 529, 532 (5th Cir. 2003). According to the Supreme Court and Fifth Circuit, "common authority":

> is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent . . . rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Shelton, 337 F.3d at 532 (quoting United States v. Matlock, 415 U.S. 164, 172 n.7 (1974)); see also Gonzales, 121 F.3d at 938 (stating that, to establish actual authority to consent, "the government must demonstrate mutual use of the property by persons

generally having joint access or control for most purposes"). If the defendant "has already substantially ceded his expectation of privacy" to the third-party, then the defendant has "assum[ed] the risk" that the third-party might expose his or her privacy interest to others. Shelton, 337 F.3d at 535-36.

In this case, the Defendants argue that Kiser did not have authority to consent to a search because she put the officers on notice that she was unsure whether she could allow them into the house. (See, e.g., Def.'s Brief in Supp. of Mot., D.E. 55, at 5.) Defendants also point to the fact that Kiser did not consent until after Deputy Davila *told her* she had the authority to do so. (Id.) Therefore, Defendants reason that, at the time the officers entered the house, "they did not have sufficient information to determine whether Ms. Kiser had authority to consent to a search of all areas of the house". (Id.) Defendants' argument is unpersuasive, however, because it confuses the issues of actual and apparent authority. In Illinois v. Rodriguez, the Supreme Court held that the question of whether *apparent* authority exists is determined by looking at the facts available to the officer at the time of the consent. Id., 497 U.S. 177, 188 (1990). The question of *actual* authority, on the other hand, turns on whether the evidence at the suppression hearing establishes that the consenting third party has "joint access" to the house for most purposes, *regardless* of what

the officers, or third-party, believe at the time of the consent.[4] See, e.g., Shelton, 337 F.3d at 532; United States v. Chaidez, 919 F.2d 1193 (7th Cir. 1990).

Thus, courts have found actual authority even when the officers could not reasonably believe that authority existed at the time of the search. See United States v. Chaidez, 919 F.2d 1193 (7th Cir. 1990). In Chaidez, for example, a woman named Silva told the police that she did not own the house they wanted to search. Id. at 1196. Instead, Silva told the officer that she rented the house for her father, and that she had only come to the house to do her father's laundry. Id. The police then asked Silva for permission to search the house, which she gave. Id. Silva's father, defendant Chavira, later filed a motion to suppress evidence found at the house, arguing that Silva did not have authority to consent to the search. Id. at 1201. The Chaidez court agreed with Chavira that there was no *apparent* authority

---

[4] If, as Defendants contend, all questions of authority are determined by looking at what the law enforcement officers reasonably believed at the time, there would be no need for courts to distinguish between "actual" and "apparent" authority at all. The Supreme Court, however, has clearly indicated that actual and apparent authority are separate inquiries. As the Court held in Rodriquez, "[i]f [apparent authority does not exist], then warrantless entry without further inquiry is unlawful *unless authority actually exists*." Rodriquez, 497 U.S. at 188-89 (emphasis supplied); United States v. Rosario, 962 F.2d 733, 737 (7th Cir. 1992) ("Either actual or apparent authority will do"); United States v. Chaidez, 919 F.2d 1193, 1201 (7th Cir. 1990) ("Apparent authority is sufficient but not necessary; if [a person] had *actual* authority, that is enough").

because the officers could not reasonably infer that Silva had authority to consent based on her representations to them.  Id. Nevertheless, the Chaidez court upheld the search on the grounds that, even though the officers could not reasonably believe that Silva had authority at the time, she did in fact have *actual* authority.  Id. at 1202.  In finding that Silva had actual authority, the court looked to certain facts of which the officers were not aware at the time of the search, including the fact that (1) Silva paid the utility bills, which were in her name, (2) she kept clothing in the house, and (3) the owner of the property testified that he rented the house to both Silva and her father. Id.  The Chaidez court held that the Fourth Amendment is not violated "if the police unreasonably, but correctly, believe the third party is authorized to consent." Id. at 1201-2.  The court reasoned that "[i]f someone who *actually* has a privacy interest surrenders that interest voluntarily, [it] may not later [be] claim[ed] that the police should have refused the offer." Id. at 1202 (emphasis supplied).  In sum, Chaidez stands for the proposition that actual authority is determined by looking at a third-party's existing "use," "access," and "control" of a premises, without regard to what the officers reasonably believed at the time of the search.

The reasoning of Chaidez applies with equal force to this case.  The fact that Kiser put the officers on notice that she was

unsure whether she could consent to the search is irrelevant to the question of actual authority.  Assuming, without deciding, that Kiser did not have apparent authority because she equivocated regarding her ability to consent, the testimony at the suppression hearing establishes that she *actually* had authority to consent regardless of what she and the officers thought at the time.  The testimony at the suppression hearing established that Kiser and her children had been living in the home for about a week.  (See, e.g., SH at 2:21:20, 3:00:15.)  Upon being interviewed following the search of the home, Kiser indicated that she was living at the house with Oscar and Celestina Garza in exchange for performing certain housekeeping duties.  (See SH at 3:12:00.)  Although Kiser did not have a key to the house[5], she indicated to the officers that she was able to come and go from the house at will.  (SH at 2:36:05.)  That Kiser had "joint access" to the house for most purposes is reinforced by the fact that she was alone in the house while Oscar and Celestina Garza were away in Corpus Christi with Kiser's children.  (SH at 2:35:00.)  Kiser also acted in a manner consistent with having "joint access" to the house by doing such things as offering one of the illegal aliens a glass of water (SH at 3:21:30), being present in the kitchen of the house before the officers arrived, (SH at 3:24:40), and answering the front door of

---

[5] Courts have rejected the proposition that possession of a key is "necessary to establish authority over the premises."  See Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994).

the house when the officers knocked (SH at 2:33:05).

In other words, the testimony at the suppression hearing shows that Kiser was a resident or co-tenant of the house. The evidence does not support Defendants' claim that Kiser was a "mere visitor" to the house. (See, e.g., Mot. to Supp., D.E. 42, at p. 3.) Rather, Defendants substantially ceded their expectation of privacy in the common areas of the house by letting Kiser live there and occupy the house when they were away. See Shelton, 337 F.3d at 535-36. Furthermore, as the Government noted, the fact that Kiser cooked and cleaned in the house in exchange for room and board "establish[es] her as a co-tenant of the home . . . just as surely as if cash were paid for rent." (D.E. 56 at 5-6.) Courts have frequently held that "[i]t is well established that an adult co-occupant of a residence may consent to a search." See, e.g., United States v. Jones, 193 F.3d 948, 950 (8th Cir. 1999). As one court noted:

> valid consent may be given by any one of the co-habitants of a premises, even though no other co-habitant has consented. This principle follows from the rationale that co-habitants have joint access or control for most purposes and therefore have the right to permit the inspection as their own right-each co-inhabitant has assumed the risk that one of their number might permit the common area to be searched.

United States v. Hylton, 349 F.3d 781, 785 (4th Cir. 2003); United States v. Douglas, 135 Fed.Appx. 4, 6 (8th Cir. 2005) (unpublished) (noting that a finding of "common authority over the premises follows as a matter of law" from a finding that a person was a

-11-

resident of the premises at the time of search); United States v. Dozal, 173 F.3d 787, 792 (10th Cir. 1999) ("A person who resides with the defendant and engages in mutual use of the property may authorize a warrantless search"); United States v. Iribe, 11 F.3d 1553, 1556 (10th Cir. 1993) (finding a third-party "clearly had joint access to the house inasmuch as she was living with [the defendant]"); United States v. Woods, 560 F.2d 660, 666 n.8 (5th Cir. 1977) ("While the record is not clear as to whether Brenda Jones jointly owned the house that was searched, it is clear that she was living there at the time and therefore could authorize the search"). Therefore, the Court finds that Kiser had actual authority to consent to a search of the common areas of the house. Because the Court finds that Kiser had actual authority to consent to search, it is unnecessary to decide whether she also had apparent authority to consent.

### 2. Scope of Consent

Defendants argue that even if Kiser had authority to consent to a search of the common areas of the house, the officers could not have reasonably believed that Kiser had given them permission "to search every room in the house, even those with a closed door and therefore the scope of the search was unreasonable." (See D.E. 43 at 3.) Defendants' argument is unpersuasive, however, because the evidence shows that almost immediately after the officers entered the house, they observed several people sitting on the

floor of kitchen.  (SH at 2:09:50.)  The officers approached and found nine people in the kitchen trying to stay out of view of the door.  (SH at 2:10:10, 2:38:10.)  Once the officers found these people in the kitchen, they were entitled to conduct a "protective sweep" of those areas of the house "where a person may be found" because they had reasonable, articulable suspicion that there may have been additional people in the house who posed a risk to officer safety.  United States v. Gould, 364 F.3d 578, 587-90 (5th Cir. 2004).  The Fifth Circuit has held that a protective sweep may include a "cursory inspection" even of those "areas of the home where the police *otherwise* . . . have no right to go."  Id. at 587.  In other words, the protective sweep could include *all* the rooms in the house even if Kiser could not, or did not, consent to those rooms being searched.  Because the officers in this case inspected only those places within the house where a person could be hiding, their sweep of the entire house was reasonable.

    **B.   Voluntariness of Consent**

Defendants' final argument is that Kiser's consent to search the house was not voluntary and, therefore, invalid.  In addition to proving that there was authority to consent, the government also must prove "by a preponderance of the evidence that consent was given freely and voluntarily."  Richard, 994 F.2d at 250 (citing United States v. Kelley, 981 F.2d 1464, 1470 (5th Cir. 1993)); see also Gonzales, 121 F.3d at 938.  "The ultimate determination

whether consent was voluntary is a question of fact to be determined from the totality of the circumstances; no single factor is dispositive." Gonzales, 121 F.3d at 939. The Court should consider six main factors in determining whether consent is given voluntarily: (1) the person's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the person's cooperation with the police; (4) the person's awareness of her right to refuse consent; (5) the person's intelligence; and (6) the person's belief that no incriminating evidence would be found. Richard, 994 F.2d at 250-51.

In this case, the Court finds that Kiser's consent to search the house was freely and voluntarily given. Kiser was not "under arrest" or "in custody" at the time the officers asked her for permission to search the house. (See, e.g., SH at 2:27:00.) When Kiser answered the door, the officers immediately informed her of the reason they were there and told her that they wanted to make sure that she was alright. (SH at 2:33:05, 2:34:25.) After asking for consent to search, the officers informed Kiser that she had the right to refuse to give consent if she wished. (See, e.g., SH at 2:35:35.) Although Kiser equivocated somewhat regarding whether she wanted to give consent, there is no evidence that she ever asked the officers to leave or told them that she didn't want to speak to them. Furthermore, there is no indication that the officers engaged in the kind of coercive practices of which courts have disapproved in other cases. See United States v. Tompkins,

130 F.3d 117, 122 (5th Cir. 1997) ("other coercive police procedures were absent, i.e., Tompkins was not handcuffed until the search revealed the presence of methamphetamine, no threats or violence were used, and there was no overt display of authority"); United States v. Gonzalez-Basulto, 898 F.2d 1011, 1013 (5th Cir. 1990) (stating that "[t]he agents did not brandish any weapons or threaten Gonzalez in any way").  Although Agent Diaz did indicate that he would call the Immigration and Customs Enforcement ("ICE") agency if Kiser refused consent, the officer's statement of his intent to continue investigating suspicious activity is not alone sufficient to make Kiser's consent involuntary in this case.  See United States v. Compton, 704 F.2d 739, 742 (5th Cir. 1983) (officers statement of "intent[] to obtain a warrant if he did not consent" did not render consent involuntary); Tompkins, 130 F.3d at 122 (considering the manner in which an officer presents the possibility of obtaining a warrant in determining whether consent is voluntary); United States v. Duran, 957 F.2d 499, 502 (7th Cir. 1992) (*bona fide* threat to obtain a warrant was "not coercive under the fourth amendment").  Under these circumstances, the Court finds that Kiser's consent to the search was voluntary.  Because Kiser had authority to consent to the search of the house and gave that consent freely and voluntarily, the officers did not violate the constitution and Defendants' motions to suppress are DENIED.

### III. CONCLUSION

For the reasons discussed above, Defendants' Motions to Suppress (D.E. 42, 43, 46) are DENIED.

SIGNED and ENTERED this 18th day of August, 2006.

_____
Janis Graham Jack
United States District Judge